**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AIR ALLIANCE HOUSTON, *et al.* | ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil Action No.: 17-2608-APM |
| UNITED STATES CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD, | ) ) ) ) ) |  |
| Defendant. | ) ) |  |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

I. **PLAINTIFFS HAVE STANDING**

Because the Board cannot justify or excuse its 20-year delay in promulgating a regulation that not only is clearly required by law, but also constitutes one of its "three primary tasks," Board Memo, Doc. 21-2 at 4, the Board devotes most of its Memo to attacking Plaintiffs' standing. However, as shown in their Motion for Summary Judgment, Doc. 15, Plaintiffs have standing several times over. For the case to go forward, only one Plaintiff need have standing on one basis. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). Yet, Plaintiffs demonstrated that several Plaintiffs have standing on multiple bases. Specifically, Plaintiffs Air Alliance Houston (AAH), Louisiana Bucket Brigade (LBB) and United Support and Memorial for Workplace Fatalities (USMWF) meet the requirements for organizational standing; these plaintiffs and individual plaintiff Neil Carman, PhD also meet the requirements for informational standing; and plaintiffs AAH and LBB meet the requirements for associational standing.

A.  **Plaintiffs AAH, LBB, USMWF and Neil Carman Have Informational Standing**

The Board misreads the law in contending that Plaintiffs lack informational standing, and then improperly conflates informational and organizational standing to claim that Plaintiffs therefore also lack organizational standing.  The Board admits that it is statutorily required to provide public access to "any records, reports and information obtained by the Board."  42 U.S.C. § 7412(r)(6)(Q).  Not only does the broad general language of this provision ("any records") necessarily include the reports of accidental releases that would be required by the reporting regulation, but it specifically references "release or emissions data" and exempts such data from possible withholding as confidential.  *Id.*[1]  The Board nevertheless argues that Plaintiffs lack informational standing because there is no statutory requirement for the information required by the reporting regulation to be disclosed to the public.  Board Memo at 11.

There are two apparent bases for this ostensibly illogical claim.  First, the Board appears to be arguing that the requirement to report information and the requirement to make that information publicly available must be <u>in the same subsection</u> of the statute at issue.  Here, the provision requiring an accidental release reporting regulation and the section requiring public disclosure of reports to the Board are both parts of 42 U.S.C. § 5412(r), which creates the Chemical Safety Board and sets out its functions and requirements.  The Board cites no authority for its strange proposition that there is no statutory public disclosure requirement if it is in a different subsection of the same statutory provision.  Moreover, here there was no need to have a separate public disclosure requirement in 42 U.S.C. § 7412(r)(6)(C)(iii), which requires the

---

[1] There is no need to address whether 42 U.S.C. § 7412(r)(6)(C)(iii) alone confers informational standing because the public availability of the accidental release reports is implicit, since the statute contains an explicit command to make public all reports and information obtained by the CSB, including "release or emissions data."

release reporting regulation, because the broad general disclosure requirement in § 7412(r)(6)(Q) covers all of the information that could be generated from the regulation.

Second, the Board appears to claim that a statutory disclosure requirement does not confer standing unless it requires disclosure <u>in the Federal Register.</u>  That some of the informational standing cases do involve such a statutory requirement does not mean that it is essential for informational standing.  In fact, the seminal informational standing case, *Federal Election Com'n v. Akins*, 524 U.S. 11, 13 (1998), did not concern a requirement for publication in the Federal Register, but requirements under the Federal Election Campaign Act for "political committees" to file public reports with the Federal Election Commission.  In *Public Citizen v. Dep't of Justice,* 491 U.S. 440, 449 (1989), the Supreme Court found that a claim of failure to disclose information under the Federal Advisory Committee Act (FACA) conferred standing.  FACA includes a requirement that transcripts, recordings or minutes of committee meetings be made available to the public in an easily accessible place and copies of the same be furnished to individuals on request. 5 U.S.C. § 552b(f)(2).  There is no distinction between those situations and this one where a reporting requirement would require filings with the Board that would then be made available to the public.

In addition, this Circuit has characterized informational standing as requiring that the plaintiff be deprived of information that a statute requires the government <u>or a third party</u> to disclose to it, *e.g. Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016), making the disclosure requirement far broader than government publication in the Federal Register (or anywhere).

Thus, nothing in the Board's reply has undermined the Plaintiffs' case for informational standing as set out in their Summary Judgment brief (Doc. 15).

B. **Plaintiffs AAH, LBB, USMWF Have Organizational Standing**

The Board's argument against organizational standing is limited to claiming that because Plaintiffs' claims for organizational standing rest on injury to their organizational functions from the lack of information that would be supplied by a release reporting regulation, the lack of informational standing also precludes organizational standing. This argument is belied by the fact that Plaintiffs do in fact have informational standing, as described above. In addition, even assuming that informational standing were lacking, it would not mean that Plaintiffs do not have organizational standing. The two types of standing have different requirements and must be analyzed separately. *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 22-29 (D.C. Cir. 2011) (analyzing informational and organizational standing separately); *Friends of Animals*, 828 F.3d at 994-95 (criticizing the Sixth Circuit's "apparent conflation of informational and organizational standing," and noting that the plaintiff in that case might have organizational standing even though it did not have informational standing); *Campaign Legal Ctr. v. FEC*, 245 F. Supp. 3d 119, 127-8 (D.D.C. 2017) (plaintiffs need not meet requirements for organizational standing when they have met requirements for informational standing).

Informational standing is defined by the disclosure requirements set out by Congress, and "a plaintiff seeking to demonstrate that it has informational standing generally 'need not allege any additional harm beyond the one Congress has identified.'" *Campaign Legal Ctr. v. FEC*, 245 F. Supp. 3d 119, 124 (D.D.C. 2017) (quoting *Friends of Animals,* 828 F.3d at 992) (quoting *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2015)) (emphasis in original). Thus, a plaintiff need not meet the requirements of organizational standing to have informational standing. Likewise, organizational standing does not necessitate a statute requiring disclosure of information, but instead requires a showing of "concrete and demonstrable injury to the

organization's activities -- with the consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

While organizational standing is not premised on a statute requiring disclosure of information, it may be based on a lack of access to information upon which the organization relies to perform its programmatic functions and services. *People for the Ethical Treatment of Animals v. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding organizational standing based in part on a deprivation of information); *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (finding organizational standing based on regulations restricting the flow of information to plaintiff); *Nat'l Veterans Legal Servs. Program v. Dep't of Defense*, 2016 U.S. Dist. LEXIS 110492, *21 (D.D.C. 2016) (finding organizational standing based on lack of access to information); *Natural Resources Defense Council v. Jamison*, 787 F. Supp. 231, 237 (D.D.C. 1990) (reduction or restriction of the flow of information necessary to further legitimate organizational interests is sufficient to confer standing).

Plaintiffs AAH, LBB and USMWF have amply demonstrated organizational standing based on injury to their core services and daily functions of providing information and assistance to citizens living or working near industrial facilities about their exposure to accidental chemical releases and about how to protect themselves from such emissions, as well as injury to their functions of advocating for improved chemical safety and the prevention of accidents. Doc. 15 at 16-22, and Decls. of Nelson, Rolfes and Miser, Docs. 15-1, 15-2 and 15-3.

In this case, because there is also a statute requiring disclosure, these Plaintiffs meet the requirements for both informational and organizational standing.

C. **Plaintiffs AAH and LBB Meet Associational Standing Requirements**

As noted above, only one type of standing for one plaintiff is necessary for the case to go forward, and therefore once the Court finds one type of standing for any plaintiff, it need not consider the other types of standing. However, Plaintiffs AAH and LBB also meet associational standing requirements, meaning standing based on injury to their members. The Board does not dispute that the interests these organizations seek to protect in this litigation are germane to the organizations' purposes or that the litigation would not require the participation of individual members. Instead, the Board argues that these organizations do not qualify because they are not traditional membership organizations, and that in the case of LBB, its purported members would not have individual standing.

However, LBB does have a membership, consisting of contributors of at least $15 per year, volunteer air samplers and members of the local community groups that LBB supports, Board members, staff members and the Executive Director. Rolfes Decl., Doc. 15-2 at ¶ 4; Att. A, Bylaws, Art. II, Sec. 2. Members participate in fundraising, recruiting members for the organization and its committees, and in the programs and activities of the organization. *Id.*, Art. III, Sec. 2. Members may also serve on committees of the organization when appointed by the elected Board. *Id.*, Art. V, Sec. 1. Board members are selected from nominations submitted by Board members and other members and are elected by a majority of the members. *Id.,* Art. III, Sec. 3. Thus, LBB is a traditional membership organization, and need not meet the "indicia of membership" criteria of *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) for organizations that are not traditional membership organizations. However, LBB does meet those criteria of electing the organization's leadership (the Board), serving in the entity, and financing the organization's activities. *See Hunt*, 432 U.S. at 344-45.

Moreover, at least one of LBB's members meets the requirements for individual standing. Anne Rolfes, the Founding Director, and therefore also a member of LBB, Rolfe Decl., Doc. 15-2 at ¶ 3, has testified that in the course of her job duties, she visits fenceline communities near chemical plants and refineries, and is exposed to chemical emissions and experiences fear and anxiety about accidental releases. *Id.* at ¶ 5. She is also impacted professionally by the lack of a release reporting requirement because she is not able to assist the community members that LBB serves with information about exposures during accidental chemical releases. *Id.* at ¶ 6-7. She is also exposed to chemical releases during LBB annual bike rides. *Id.* at ¶ 10. She also testified to the injuries to specific community groups who are members of LBB. *Id.* at ¶ 9. As opposed to the current situation where it is almost impossible to obtain timely information about accidental releases, *id.* at ¶ 7, a reporting regulation would require submission of prompt and complete information to the CSB and the public that would assist the public in taking measures to protect themselves, and would assist the CSB in performing its functions to investigate accidents and recommend safety improvements. *Id.* at ¶ 11. *See also* Doc. 15 at 27-31.

The Board nevertheless argues that Ms. Rolfes has not established injury because the operative statute does not require that reports concerning releases be made available to the public. As discussed above, this is only true if one ignores the requirement at 42 U.S.C. § 7412(r)(6)(Q) to make public all reports to the Board, specifically including release or emissions data.

The Board also argues that Plaintiffs' assertion supporting their claim of injury that the reporting regulation would improve the CSB's functions of investigating accidents and recommending safety improvements is unsupported. In making this argument, the Board discounts its own statements and the conclusions of four reports of oversight agencies that a

reporting requirement would do just that. Doc. 21-2 at 16-17 and n. 15. The Board also raises something of a red herring in claiming that the reporting regulation would not affect the Board's choice of incidents to investigate, improve the Board's screening process for selecting incidents to investigate, or increase the number of investigations. Plaintiffs have not made these claims, but rather that, as the Board itself and the GAO found, the information derived from a reporting requirement would "help both the agency and other organizations to identify issues and trends, and thereby further the cause of preventing chemical incidents." 74 Fed. Reg. 30259; Doc. 15 at 28-29.

In addition, these claims by the Board regarding the lack of effect of a reporting regulation on its investigations are also factually incorrect. They are based on the Declaration of Stephen Klejst, Doc. 21-3, who had been employed by the Board for five months at the time of his Declaration. Klejst Decl. at ¶ 3. As explained in the Declaration of Daniel Horowitz, Ex. A hereto, who was employed by the Board for 18 years, with eight of those years as the Board's Managing Director, Horowitz Decl. at ¶ 4, a reporting regulation would supply the Board with significant information that is not now available that would assist the Board in overall data collection, trend analysis, and identifying areas of particular risk. *Id.* at ¶¶ 10-16. A reporting regulation would also make accident investigations better targeted and more efficient, *id.* at ¶ 23, allow future investigations to be chosen more wisely, and support better conclusions and recommendations in future reports, for example, by providing readily available data about related accidents that could support recommendations for safety improvements. *Id.* at ¶ 25.

## II. THE BOARD HAS UNLAWFULY WITHHELD AND UNREASONABLY DELAYED THE PROMULGATION OF AN ACCIDENTAL RELEASE REPORTING REGULATION

The Board does not dispute that it has a non-discretionary duty to promulgate an accidental release reporting regulation, as set out in its authorizing statute in the Clean Air Act Amendments of 1990.  Nor does the Board dispute that it has failed to do so since it began operations in 1998.  Rather, the Board unsuccessfully attempts to argue that its 20-year delay in implementing an acknowledged statutory duty is not unreasonable.  Implicitly acknowledging the weakness of its position, the Board proposes in the alternative that it have two years to complete the regulation.  Doc. 21-2 at 20-21.

The Board essentially asserts the right to ignore Congress' direction to promulgate an accidental release reporting regulation as one of its three primary duties, claiming that the regulation would not be very useful and that other activities should be prioritized.  Doc. 21-2 at 21.  Nothing in its brief or in the Klejst Declaration indicates that the Board would <u>ever</u> comply with its statutory mandate absent court intervention.  If the Board believes that a reporting regulation would not be beneficial or a good use of its resources, its remedy is with Congress, which would need to amend the Board's statutory charter to eliminate that requirement.

Moreover, even if the Board were empowered to ignore congressional direction, its protestations that a reporting regulation would not be beneficial are not credible.  At least as late as 2009, the Board took the position that such a regulation "would be helpful to the CSB in improving the timeliness, completeness, and accuracy of the information it now collects on chemical incidents," that a rule could "potentially improve the CSB's ability to learn of certain incidents in a timelier manner before an accident site is disturbed or evidence is lost," and "could help the agency develop better information on chemical incidents occurring in the United States,

and help both the agency and other organizations to identify issues and trends, and thereby further the cause of preventing chemical incidents." 74 Fed. Reg. 30260.

Mr. Klejst asserts that since 2009, the internet and other newsgathering and information sources have developed such that the Board can learn of serious chemical accidents without a reporting regulation. Klejst Decl. at ¶ 21. Mr. Klejst offers no further explanation or supporting evidence for the inherently doubtful claim that such developments since 2009 have removed the previously acknowledged need for a reporting requirement. Dr. Horowitz, who, unlike Mr. Klejst, was at the Board in 2009, attests that internet sources of information about chemical accidents were functioning to a similar extent as they are now in 2009. However, both then and now, these sources are of limited utility without a legal requirement to report. Horowitz Decl. at ¶ 17. Further, Mr. Klejst does not address the benefits from a reporting rule of more complete, timely and accurate information, enabling the Board to act before a site is disturbed or evidence destroyed; or the help a regulation would provide in identifying issues and trends that could further the cause of preventing chemical incidents.

Moreover, the Klejst Declaration lacks credibility in its assertion that a reporting requirement would not be useful in other ways. In attempting to justify why a reporting regulation is not needed, Mr. Klejst claims that the CSB already receives the information it needs from other sources. Klejst Decl. at ¶ 27. But he inconsistently claims the Board does not have the budget to receive and process the chemical release reports that a regulation would require, implicitly admitting that a regulation would supply significant additional information compared with what the Board now receives. *Id.* at ¶ 23.

Furthermore, Mr. Klejst's claims about competing priorities and that a promulgation of a release reporting rule would be prohibitively expensive do not withstand scrutiny. Mr. Klejst,

Decl. at ¶ 24, erects the straw man of an estimated $450,000 annual cost for a dedicated reporting line.  However, low or no cost alternatives such as using the NRC's existing phone service or website or a CSB website could be utilized.  Horowitz Decl. at ¶ 19.  Mr. Klejst asserts competing priorities (mainly accident investigations) and lack of resources. However, the Board engages in many optional activities that are not required by law, Horowitz Decl. at ¶ 20, over half of the Board's current staff are not doing investigative work and some of these could be assigned to work on the regulation, and in fact Board staff had already begun work on forms and data entry tools that could be used to support a reporting regulation, *id.* at ¶¶ 21, 23, and the agency likely has funds to hire contractor support.  *Id.* at ¶ 22.

Accordingly, the Court should rule that the Board has unlawfully withheld and unreasonably delayed the promulgation of an accidental release reporting regulation.  The Court should not accede to the Board's request that it have 24 months to do so.  While Mr. Klejst refers to "internal estimates" of the time needed to complete a final rule, he does not reveal who made those estimates or how, or what information they are based on.  Klejst Decl. ¶ 31.  This entirely conclusory claim should not be accepted by the Court.  Based on his extensive experience at the Board, Dr. Horowitz estimates that a one-year timeframe will provide adequate time to complete the rule.  Horowitz Decl. at ¶ 25.  This timeframe is more appropriate given the extremely lengthy and unjustified delay to date.

                                                Respectfully submitted,

/s/ *Paula Dinerstein*
Paula Dinerstein
D.C. Bar No. 333971
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring MD  20910
202-265-7337
pdinerstein@peer.org

Counsel for Plaintiffs