# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIR ALLIANCE HOUSTON, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No.: 17-2608-APM |
| ) | |
| UNITED STATES CHEMICAL ) | |
| SAFETY AND HAZARD ) | |
| INVESTIGATION BOARD, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF DANIEL HOROWITZ, PhD

1. My name is Daniel Horowitz and I make this declaration based on personal knowledge to which I am competent to testify.

2. I make this declaration pursuant to 28 U.S.C. § 1746.

3. I received my PhD in organic chemistry from the University of Cambridge, UK in 1994.

4. I served as Special Assistant to the Chemical Safety Board (CSB or Board) from 2000 to 2005. I then became the Director of Congressional, Public and Board Affairs from 2005 to 2010. I was then appointed to the position of Managing Director of the Board and served in that position until 2018.

5. In my capacity as Managing Director, I supervised (subject to the direction of the Board's chairperson) the CSB's principal functions including accident investigations, safety studies, recommendations development and evaluation, administration, human resources, budgeting and finance, Congressional affairs, public and media relations, safety video development, IT, and strategic planning. I directed and oversaw most CSB career staff, including approximately 32 investigators, scientists, engineers, attorneys, budget officers,

and administrative professionals.

6. As Managing Director, I directed the CSB's investigations of major industrial chemical accidents around the country. I oversaw the deployment of multi-disciplinary investigative teams to major accident sites and managed the completion of investigation reports, including reports on the Chevron, Tesoro, Bayer, DuPont, and Deepwater Horizon disasters.

7. As Managing Director, I worked to modernize the procedures for selecting incidents to investigate, updated the agency's investigation protocol to standardize work across teams, and develop scoping procedures to better forecast investigation resource needs.

8. I have reviewed the Declaration of Stephen J. Klejst, the recently hired (February 2018) Executive Director of Investigations and Recommendations for the CSB.

9. In my judgment and based upon my professional experience, his declaration contains several statements that are inaccurate or reflect a lack of experience with the CSB's history and mission.

10. Mr. Klejst claims that reports from the National Response Center (NRC), along with media reports, are an adequate means to inform the CSB of chemical incidents. However, NRC reports are prone to inaccuracy. They are not necessarily even filed by the subject companies; anyone can generate an NRC report (members of the public, emergency responders, state or local agencies etc.). The reports are not necessarily corrected or updated when new information becomes available or when the consequences of an accident are better known. To the extent that companies are currently required to report incidents to the NRC, those requirements originate in other statutory or regulatory provisions unrelated to the statutory provisions creating the CSB.

11. Media reports can provide a rapid notification of many incidents but not all. Some incidents are never reported to media or only weeks or months after they happened. There is no requirement that a company notify media about a release or a fatality caused by a release.

12. Therefore, these sources do not provide the completeness or quality of information of a well-implemented reporting requirement.

13. In addition, Mr. Klejst is dramatically narrowing the purpose of a release reporting rule by asserting that that it is only so that CSB can make deployment decisions to handful of obviously significant incidents each year. The statute does not state that this is the purpose of the reporting regulation requirement. Reporting can serve a variety of other purposes like overall data collection, trend analysis, and identifying industries or processes at particular risk.

14. Also, a reporting rule could require companies to file an initial notification and then file a follow-up report some days or weeks later once the consequences are fully known and e initial causal information has been developed. The Contra Costa County Industrial Safety Ordinance in California, which is credited with improving the accident rate at covered facilities in that region, requires companies to file initial and follow-up reports on incidents, as the circumstances and consequences become better known.

15. A reporting rule would supply better information on accident frequency and trends, and industries or workers or communities at risk. It would provide the ability to compel companies to file detailed information on accidents. Not all companies cooperate fully with a mere phone call from a CSB screener, which is the existing method after a media search reveals an accident.

16. With a reporting regulation, community groups could get better accident data which would allow them to perform various functions – such as more effective participation in industry-sponsored community advisory groups and in federally-required local emergency planning committees.  Community groups could publicize and seek regulatory or enforcement actions against companies with safety problems, based on reported accident history (as is now happening with a refinery in Torrance, California).

17. Mr. Klejst claims, ¶ 21, that developments in the internet and other news sources since the CSB described the value of a reporting rule in its 2009 Advanced Notice of Proposed Rulemaking have changed the need for the rule.  However, internet news sources were already functioning to a similar extent as now in 2009 when the CSB argued they might not be adequate.  Internet and news sources were and still are obviously limited in their utility by the fact that companies are not required to report incidents to the media and are not required to report information accurately or completely, even if they do make some disclosure to the media.  Most companies will tend to minimize these media disclosures or downplay the consequences of an incident that will otherwise damage their reputation in a community, harm their stock values, or damage business relationships.

18. Mr. Klejst claims, ¶ 23, that the CSB is not currently budgeted for additional resources that would be required to receive and process chemical release reports directly to the agency.  However, CSB has not made any requests for such funding in recent years and Mr. Klejst is not claiming that it would not be possible to get such funding.  Moreover, the claim that additional resources would be required to process reports from a reporting regulation contradicts Mr. Klejst's claim that a regulation is not needed because CSB

already receives all the information it needs from the NRC and the media, and presumably already has all the resources needed to process them.

19. Mr. Klejst claims, ¶ 24, that a dedicated CSB reporting line is estimated to cost $450,000 per year. However, a dedicated reporting line is not the only option for collecting reports. CSB could promulgate a rule requiring incidents to be reported to the NRC's existing phone service or web site without cost or at a much lower cost. A dedicated phone line with 24-hour operator coverage just for the CSB is not essential. Also, the CSB has in the past taken the position that it could require reporting directly to CSB, e.g. through a web site form, that would cost little to create and maintain.

20. Mr. Klejst claims, ¶ 27, that "competing priorities" have prevented CSB from completing promulgation of the release reporting requirement. However, much of what CSB spends money on and terms "competing priorities" are not statutory duties at all. Board members travel the country and world doing what they consider to be worthwhile outreach to audiences; CSB maintains a video/educational program; CSB has a multi-person department dedicated to "evaluating, in detail and in writing" how recipients have responded to recommendations; CSB maintains a "drivers of critical chemical safety change" program of emphasizing certain recommendations or themes and issuing written and other materials. Thus, the CSB has made a choice to prioritize it resources on these various non-statutory functions over performing the statutory duty to promulgate a reporting regulation.

21. Mr. Klejst claims, ¶ 28, that the Board has prioritized accident investigations and recommendations. However, with currently fewer than 12 investigators, *id.* ¶ 13, more

than half of the agency staff is already doing non-investigative work. So, there is available capacity to devote resources and staff to developing the reporting rule.

22. Mr. Klejst asserts, ¶ 30, that it would require contract support to complete the reporting rule. However, the Board has lost multiple staff employees during FY 2018 and likely has funds available that could be spent for contract support, if any were needed.

23. Mr. Klejst claims, ¶ 32, that completing the reporting rule would divert agency resources from investigative work. Actually, having a reporting rule could make investigations better targeted and more efficient. Moreover, as stated above, most of the agency staff is not involved in investigations and some of these could be assigned to development of the reporting rule. When I was Managing Director at the CSB between 2010 and 2015, the staff had already developed various forms and data entry tools that could be used to support a reporting rule.

24. Based on my experience managing most of the functions of the CSB, twelve months would likely be sufficient to complete the rule, including a notice and comment process.

25. A reporting rule could probably be developed and finalized with less effort and less contractor support than is required for just one sizeable investigation that the CSB now conducts. But the data from a rule could allow future investigations to be chosen most wisely. Also, the data from a rule would support better conclusions and recommendations in future reports -- for example, the CSB would be far better positioned to advocate for a particular regulatory improvement if it had conclusive data that the particular safety issue was the cause of many accidents in the past. Currently, if an investigative team is seeking to develop such a recommendation, the team has to go back and try to reconstruct years of external data about possible related accidents, using media

reports and OSHA inspection records. Those efforts are labor intensive and likely omit pertinent accidents, and the available records often lack adequate details about incident cause. There are numerous examples where CSB has had to do this reconstruction activity, including reactive chemical accidents for the CSB's 2002 reactive hazard study; combustible dust incidents for the 2006 dust study; and confined space fire incidents for the 2010 Xcel Energy report.

26. In sum, it is my judgment that the benefits of an appropriately-implemented reporting rule to the CSB's future functioning, as well as to outside advocacy groups, outweigh the resources and costs required to create the rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 3, 2018.

*Daniel M Horowitz*

_____

Daniel Horowitz