# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
**AIR ALLIANCE HOUSTON, et al.,**                )
)
    **Plaintiffs,**                )
)
       **v.**                )     **Case No. 17-cv-02608 (APM)**
)
**U.S. CHEMICAL AND SAFETY HAZARD**                )
**INVESTIGATION BOARD,**                )
)
    **Defendant.**                )
_____ )

## MEMORANDUM OPINION

## I.     INTRODUCTION

This action seeks to compel a federal agency, Defendant U.S. Chemical and Safety Hazard

Investigation Board ("CSB" or "the Board"), to promulgate regulations requiring persons to

report accidental chemical releases to the CSB.  The CSB does not deny that its enabling statute

requires the agency to so act.  *See* 42 U.S.C. § 7412(r)(6)(C)(iii).  Instead, it advances two

contentions to fend off Plaintiffs' suit.  First, the CSB vigorously asserts that Plaintiffs lack

standing to sue.  Second, the CSB half-heartedly maintains that the agency's inaction has not been

"unreasonably delayed," even though nearly 30 years have passed since Congress enacted the

CSB's enabling statute.  The court finds neither argument has merit.  Accordingly, the court grants

judgment in favor of Plaintiffs.  As relief, the court directs the CSB to promulgate reporting

regulations within 12 months of the date of the court's order.

## II.    BACKGROUND

### A.    Accidental Release Reporting

Congress established the CSB by the Clean Air Act Amendments of 1990.  *See generally* 42 U.S.C. § 7412(r)(6).  Congress modeled the CSB on the "structure, activities and authorities of the National Transportation Safety Board."  S. REP. NO. 101-228 at 228 (1989).  The agency's mission is to investigate certain types of accidental chemical releases and to propose safety measures "to reduce the likelihood or the consequences of accidental releases."  42 U.S.C. § 7412(r)(6)(i), (ii).

To facilitate that mission, Congress directed the CSB to promulgate certain reporting requirements concerning accidental chemical releases.  The agency's enabling statute provides: The Board "shall" "establish by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction." 42 U.S.C. § 7412(r)(6)(C)(iii).  The Board does not dispute that the quoted provision imposes an affirmative obligation to adopt reporting regulations.  Yet, since beginning its operations in 1998, the CSB has not done as Congress directed.

Ten years ago, the agency did take a step towards developing regulations, but ultimately that effort came up empty.  *See generally Chemical Release Reporting*, 74 Fed. Reg. 30,259, 30,260 (June 25, 2009) [hereinafter Chemical Release Reporting.].  In July 2009, the CSB published an advanced notice of proposed rulemaking to obtain comments on "how best to proceed with implementing [the reporting] requirement" before developing the final rule.  *Id*. at 30,259. By the close of the commenting period, the CSB had received 27 comments, yet the process thereafter inexplicably came to a halt.  Compl., ECF No. 1 [hereinafter Compl.], ¶ 19; Answer, ECF No. 6 [hereinafter Answer], ¶ 19.  The CSB has not taken *any* action in the ensuing 10 years

2

to promulgate reporting regulations.  *See* Def.'s Cross-Mot. for Summ. J., ECF No. 21 [hereinafter Def.'s Mot.], Def.'s Stmt. of Issues, ECF No. 21-1 [hereinafter Def.'s Facts], at 2.

### B.    Plaintiffs' Complaint

Plaintiffs are four non-profit groups and one individual.  Plaintiff Air Alliance Houston ("AAH") is a "non-profit environmental advocacy group that works to reduce air pollution and other health and safety threats," with their efforts focused on the Houston Ship Channel area. Compl. ¶ 8.  AAH states that as a result of the CSB's failure to promulgate release reporting requirements, its staff has been directly exposed to and harmed by chemical releases when taking air quality readings after Hurricane Harvey, visiting constituent communities, and leading their daily lives as a result of their proximity to various industrial facilities.  *See* Pls.' Mot. for Summ. J., ECF No. 15 [hereinafter Pls.' Mot.], ¶ 11; *see also id.*, Ex. A, ECF No. 15-1 [hereinafter Nelson Decl.], ¶ 8.  Moreover, AAH asserts that it has expended unnecessary resources to ascertain information that would "conceivably be immediately reported" under the required regulations. Nelson Decl. ¶ 8.

Plaintiff Public Employees for Environmental Responsibility ("PEER") is a nonprofit organization headquartered in Silver Spring, Maryland.  Compl. ¶ 9.  PEER's mission includes "educating the public and speaking out, as well as defending those who speak out, about environmental ethics and compliance with environmental laws."  *Id.*  PEER avers that it works nationwide with scientists, land managers, field specialists, and other environmentally focused professionals, but it does not allege any specific harm to it or its nationwide network as a result of the CSB's inaction.  *See generally* Compl.

Plaintiff Louisiana Bucket Brigade ("LBB") is a nonprofit "environmental health and justice organization" that works with communities that neighbor Louisiana's oil refineries and

chemical plants. *See id.* ¶ 10; *see also* Pls.' Mot., Ex. B, ECF No. 15-2 [hereinafter Rolfes' Decl.], Attachment A [hereinafter LBB Bylaws]. LLB's membership consists of contributors to the organization, volunteer air samplers, members of local community groups that LBB supports, and the organization's officials. Rolfes Decl. ¶ 4; LBB Bylaws § II.1. LBB asserts that its members live or work near chemical plants, and additionally, that they partake in an annual awareness-raising bicycle ride through contaminated areas, during which members have experienced "burning of the eyes, difficulty breathing, and overall discomfort" from accidental chemical releases. Rolfes' Decl. ¶ 9. Furthermore, LBB asserts that the lack of reporting requirements has made it "exceedingly difficult" to perform one of its functions of providing timely information about accidental releases to its members. *Id.* ¶ 7.

Plaintiff United Support and Memorial for Workplace Fatalities ("USMWF") is a nonprofit organization that offers "support, guidance, and resources to those affected by preventable work-related deaths or serious injuries," such as accidents within chemical plants. Compl. ¶ 11. USMWF alleges that due to the lack of reporting requirements it has had to expend "additional resources, organizational time, and money" to supply information to families impacted by accidental chemical releases. *See* Pls.' Mot., Ex. C, ECF No. 15-3, ¶ 7. Moreover, USMWF cites several events where USMWF and the families it serves have been harmed by chemical leaks, which it avers could have been prevented if the CSB had promulgated the required reporting regulations. *Id.* ¶ 16.

The final Plaintiff, Dr. Neil Carman, Ph.D., is the Clean Air Program Director of the Sierra Club Lone Star Chapter in Texas. *See* Pl.'s Mot., Ex. D, ECF No. 15-4, ¶¶ 1, 3. Dr. Carman asserts that his ability to provide information to Sierra Club members regarding toxic air pollution and its health effects has been impaired by the CSB's failure to promulgate reporting requirements.

*See generally* ¶¶ 11, 17.  Additionally, Dr. Carman cites to several instances where Sierra Club members living in close proximity to chemical accidents suffered injuries, such as exposure to "high levels of toxic air," due to delays in the release of chemical accident information, such as several incidents that occurred when Hurricane Harvey came ashore in August 2017.  *Id*. ¶¶ 10, 13.

### C.    Procedural History

On December 7, 2017, Plaintiffs filed a one-count complaint against the CSB seeking declaratory relief and an injunction to compel the CSB to promulgate the reporting regulations. *See* Compl.  Plaintiffs contend that the CSB's failure to implement reporting regulations in the 27 years since Congress amended the CAA violates the prohibition in the Administrative Procedure Act ("APA") against agency action unlawfully withheld or unreasonably delayed.  *See* Compl. ¶ 3 (citing 5 U.S.C. § 706(1)).  Plaintiffs further allege that as public interest organizations "dedicated to ensuring accidental chemical releases are reported," the CSB's unreasonable delay has caused various injuries to the organizations and their members.  *Id.* ¶ 2.

On May 29, 2018, Plaintiffs filed a motion for summary judgment.  *See* Pls.' Mot.  The CSB opposed and filed a cross-motion for summary judgment on July 13, 2018, asserting that (1) Plaintiffs lack standing to invoke the court's jurisdiction, and (2) the agency's inaction was not "unreasonably delayed."  *See* Def.'s Cross Mot. for Summ. J., ECF No. 21, Def.'s Mem. in Support of Def.'s Mot for Summ. J., ECF No. 21-1 [hereinafter Def.'s Mem.].  The parties' motions are now ripe for consideration.

## III.    ANALYSIS

As it must, the court first evaluates Plaintiffs' standing, before turning to the merits. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998).

### A. Standing

#### 1. *Legal Standard*

Plaintiffs bear the burden of establishing that they have standing to assert their claim. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff must make a showing of three elements: (1) injury in fact, (2) causation, and (3) redressability. *See id.* at 560–61. These elements together constitute the "irreducible constitutional minimum of standing." *Id.* at 560. As here, at the summary judgment stage, mere allegations of standing do not suffice. Rather, Plaintiffs must set forth by affidavit or other evidence specific facts, which for purposes of summary judgment will be taken as true. *See id.* at 561. "Statements of fact must be sufficiently specific to rise above the level of 'conclusory allegations.'" *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

#### 2. *Theories of Standing*

Plaintiffs advance a variety of theories of standing. All Plaintiffs, except PEER, assert that they have informational standing. *See* Pls.' Mot. at 22–24; Pls.' Reply, ECF No. 23 [hereinafter Pls.' Reply], at 2–3. Three non-profit Plaintiffs—AAH, LLB, and USMWF—claim to have organizational standing. *See* Pls.' Mot. at 16–22; Pls.' Reply at 4–5. And, two non-profit Plaintiffs, AAH and LBB, claim to possess associational standing. *See* Pls.' Mot. at 24–30; Pls. Reply at 6–8. To establish its jurisdiction over this matter, the court need only find that one Plaintiff has standing. *See Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). Nevertheless, in the interest of completeness, the court addresses each theory of standing advanced by Plaintiffs.

a.      Informational standing

In *FEC v. Akins*, the Supreme Court recognized that a plaintiff can establish injury in fact when, "on [the plaintiff's] view of the law," a statute requires public disclosure of information that is otherwise withheld.   524 U.S. 11, 21 (1998); *see also id.* (describing *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 449 (1989), as holding "that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute").   Since *Akins*, the D.C. Circuit has held that to "carry its burden of demonstrating a 'sufficiently concrete and particularized informational injury,' the plaintiff must show that '(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Elec. Privacy Info. Ctr. (EPIC) v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017), *cert. denied*, No. 18-267, 2019 WL 113530 (U.S. Jan. 7, 2019) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).   There is no real dispute in this case as to the second element, so the court focuses on the first.

Plaintiffs contend that the CSB's enabling statute would require the agency to disclose information regarding accidental releases to the public, if the agency promulgated a mandatory reporting requirement as Congress directed.   As support, they point to section 7412(r)(6)(Q) of the CSB's enabling act, which provides that

> any records, reports or information obtained by the Board shall be available to . . . the public, except that upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position . . .

42 U.S.C. § 7412(r)(6)(Q). There can be little doubt that, on its face, the statute presumptively would make public any "records, reports or information obtained by the Board" as a result of a mandatory reporting requirement of accidental chemical releases. Plaintiffs' assertion of informational standing—they are injured because they cannot access information that the statute mandates the agency collect and then make available—therefore would appear to be straightforward.

But not so, says the CSB. It takes a narrow view of the Supreme Court and D.C. Circuit decisions in which informational standing has been recognized. According to the CSB, "[t]he common thread in these cases is that Congress imposed an obligation on the agency to take *affirmative actions* to disclose the documents at issue to the public and prescribed certain steps that must be taken." *See* Def.'s Reply, ECF No. 28 [hereinafter Def.'s Reply] at 5 (emphasis in original). By contrast, its argument continues, the CSB's enabling act neither "require[s] direct disclosure" nor obligates "the Board to take any specific steps to disclose information, or establish any specific mechanism by which the public can access the information." *Id.* Stated differently, the CSB contends that a plaintiff can show informational standing only when the public-disclosure law at issue requires an agency take affirmative steps as to the manner and means of making information available, whereas section 7412(r)(6)(Q) imposes no such affirmative-action requirement on the Board. *Id.* Controlling precedent does not, however, sustain the fine distinction upon which the CSB's argument rests.

In *People for the Ethical Treatment of Animals (PETA) v. U.S. Department of Agriculture*, the D.C. Circuit found that PETA had standing to sue, even when there was *no legal obligation whatsoever* that the agency make the sought-after disclosures. 797 F.3d 1087, 1095 (D.C. Cir.

2015).[1]  In *PETA*, the organization sued the U.S. Department of Agriculture ("USDA") after it failed to promulgate bird-specific rules and protections under the Animal Welfare Act ("AWA"), 7 U.S.C. §§ 2131 *et seq*.  *See* 797 F.3d at 1089.  The court summarized PETA's claims as alleging that "the USDA's failure to protect birds meant, *ipso facto,* that the USDA was not creating bird-related inspection reports that PETA could use to raise public awareness."  *Id.* at 1091.  The D.C. Circuit found, at the motion to dismiss stage, that PETA had standing to challenge the agency's inaction.  It accepted the notion that, "if the USDA applies the AWA's general welfare standards to birds, it will employ the same inspection reports and redress mechanisms for birds that it currently uses for other species," which in turn will allow PETA to carry out its mission of preventing avian cruelty and educating the public about such conduct.  *Id.* at 1095.  The court so held, even though PETA *did not* claim that the USDA "ha[d] denied PETA information to which any law or regulation entitles it."  *See id.* at 1101 (Millet, J., dubitante).  Instead, its purported informational injury rested on the assertion that it was "not receiving inspection reports for birds that the Department ha[d] *voluntarily produced* after enforcement efforts involving other animals." *Id.*  (emphasis added).  Unlike *PETA*, this case does not involve a question of voluntarily production.  Rather, under Plaintiffs' reading of the law, the CSB would be required to make public information collected through a mandatory accidental-release reporting requirement.  If the denial of voluntarily produced information can result in a sufficiently concrete injury in fact, then surely Plaintiffs' claimed denial of information that, by statute, the CSB must produce qualifies as well.

The Board's attempt to distinguish *PETA* falls flat.  It argues that "the parties in *PETA* do not appear to have contested whether the AWA and its implementing regulations gave PETA a legal right to disclosure of inspection Reports."  Def.'s Reply at 7.  Whether the parties contested

[1] Although framed as a question of "organizational standing," the claim in *PETA* was predicated on the agency's failure to produce bird-related inspection reports.

that issue or not misses the point.  The court in *PETA* considered and recognized that there was no legal right to disclosure, but nevertheless held that PETA had standing to sue to compel the agency to promulgate regulations that in turn would cause the agency to voluntarily produce information.  The case for informational standing is clearly stronger in this case.

The D.C. Circuit's decision in *Friends of Animals v. Jewell* also contradicts the Board's excessively narrow view of informational standing.  *See* 824 F.3d 1033 (D.C. Cir. 2016).  The central issue in *Friends of Animals* stemmed from the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 *et seq.*, which regulates "takings" of endangered species.  *Id.* at 1035.  Following the Fish and Wildlife Service's ("FWS") decision to reinstate a blanket exemption from rules requiring that persons apply for a license to permit all "takings" of certain species, the plaintiff organization sued the agency.  *Friends of Animals*, 824 F.3d at 1036.  Friends of Animals alleged that the agency was statutorily required to "disclose information about permitted takes" of endangered species, and that the reinstated blanket permit "den[ied] Friends of Animals this information, which Friends of Animals otherwise has a statutory right to obtain."  *Id.* at 1041.  The statute at issue in *Friends of Animals*, Section 10(c) of ESA, 16 U.S.C. § 1539(c), provided that:

> The Secretary *shall* publish notice in the Federal Register of *each application for an exemption or permit* which is made under this section. Each notice shall invite the submission from interested parties, within thirty days after the date of the notice, of written data, views, or arguments with respect to the application.... *Information received by the Secretary as a part of any application shall be available to the public* as a matter of public record at every stage of the proceeding.

*Friends of Animals*, 824 F.3d at 1041 (emphasis in original).  Based on this statutory text, the court found that the agency "must disclose information it receives in connection with any Section 10 permit . . . and [t]hus, Section 10(c) clearly creates a right to information upon which a claim of informational standing may be predicated."  *Id.*

The CSB attempts to distinguish *Friends of Animals* on the ground that the statute at issue there "required that notice of certain applications (which would contain information sought by plaintiffs) must be published in [the] Federal Register," whereas section 7412(r)(6)(Q) imposes no similar publication requirement on the CSB. Def.'s Reply at 4; *see also* Def.'s Mem. at 10 n.10. But that attempted distinction only goes so far. It is true that Section 10(c) of the ESA requires published *notice* of exemption applications in the Federal Register, but that section also requires the Secretary to make "available to the public" all information received from such applicant. That text tracks the "shall be available to the . . . public" text of section 7412(r)(6)(Q). Thus, contrary to the CSB's contention, the Circuit has found informational standing to be available even when a statute does not require the agency to "take any specific steps to disclose information, or establish any specific mechanism by which the public can access the information." Def.'s Reply at 5.

One more D.C. Circuit case is helpful in explaining why these Plaintiffs have informational standing. In *American Society for the Prevention of Cruelty to Animals v. Feld Entertainment, Inc. (Feld)*, the D.C. Circuit faced an informational standing argument once again based on Section 10(c) of the ESA. 659 F.3d 13 (D.C. Cir. 2011). The organization plaintiff in *Feld* sought to enforce Section 9 of the ESA, claiming that the Ringling Brothers and Barnum & Bailey Circus was engaging in "takes" against elephants. *Id.* at 17. The D.C. Circuit rejected the plaintiff's argument for informational standing based on the disclosure requirements of Section 10(c). *Id.* at 23–24. It reasoned that the ESA "proscribes the 'take' itself, not the failure to seek a permit, and nothing in the Act entitles the public to information every time a circus or zoo 'takes' an endangered species." *Id.* at 24. On the other hand, the court explained, if the circus applied for a permit and either the circus or the agency refused to disclose the information required to obtain a

permit, then the plaintiff "might have informational standing to bring suit for violations of section 10." *Id.* at 23.

This case is different from *Feld*. Unlike the ESA, the CSB's enabling act itself entitles the public to "reports" and other information obtained by the CSB. By not promulgating regulations that would enable the agency to receive "reports" of accidental spills, the CSB is denying the public, and these particular Plaintiffs, the very information that the act contemplates would be publicly available. Under this reading of the enabling act, Plaintiffs readily satisfy the injury-in-fact element of informational standing. *See id.* ("To establish such an injury, a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain."); *cf. Friends of Animals v. Jewell (II)*, 828 F.3d 989, 990 (D.C. Cir. 2016) (finding that where the "deadline provision" in question did "not itself mandate the disclosure of any information, [the plaintiff] has not suffered an informational injury and therefore does not have informational standing"). All Plaintiffs, other than PEER, therefore have informational standing to assert their APA claim.

b.     Organizational standing

The court now moves to organizational standing. In *Havens Realty Corp. v. Coleman*, the Supreme Court held that "an organization may establish Article III standing if it can show that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Feld*, 659 F.3d at 25 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The D.C. Circuit has established two important limitations on the scope of *Havens* standing. *See EPIC*, 878 F.3d at 378. First, a plaintiff must show "that defendant's 'action or omission to act injured the

organization's interest.'" *Id.* (quoting *PETA*, 797 F.3d at 1094).  Second, the plaintiff "must show that it 'used its resources to counteract that harm.'" *Id.* (quoting *PETA*, 797 F.3d at 1094).

The parties here disagree as to whether organizational standing must be analyzed separately from informational standing.  *See* Def.'s Mem. at 8–12 (treating the two as one and the same); Pls.' Reply at 4–5 (arguing for separate inquiries).  The court concurs with the CSB and views the two inquiries as co-extensive in this case, at least as to organizational standing's first element. Plaintiffs' claimed organizational injury is "to their core services and daily functions of providing information and assistance" to citizens potentially exposed to accidental chemical releases, as well as to "[advocate] for improved chemical safety and the prevention of accidents."  Pls.' Reply at 5. Thus, their claimed organizational injury is an informational one.   In such circumstances, the D.C. Circuit has "not engaged in a separate analysis of informational and organizational injury," because "[i]f an organization's only claimed injury is informational, additional discussion of the same facts under the 'organizational' rubric will not clarify the court's reasoning."  *EPIC*, 878 F.3d at 381 (Williams, J., concurring).  Accordingly, this court need not re-evaluate Plaintiffs' injury in fact for organizational standing purposes, when it already has held that Plaintiffs suffered a cognizable informational injury.

As to the second element of organizational standing—use of resources to counteract the harm—Plaintiffs have satisfied it.   Plaintiff USMWF, whose "mission includes providing information and resources to families who have been impacted by workplace fatalities," states that it has had to "seek information [on accidental releases] through more resource intensive avenues" due to the CSB's failure to promulgate reporting regulations that would require such information to be made public.  Pls.' Mot. at 19–20; *see also* Pls.' Mot, Decl. of Tammy Miser, ECF No. 15-3, ¶¶ 7, 9, 12.  Similarly, Plaintiff LBB's functions include providing information and assistance

"to its members and to local community groups whose members live and work near chemical plants in Louisiana." Pls.' Mot. at 18; Rolfes Decl. ¶¶ 4-5. Due to the CSB's failure to promulgate reporting regulations, LBB claims it has had to seek information about chemical emissions "through a variety of costly, inefficient, and incomplete avenues," including foreign and state databases, state agencies, National Response Center reports, and local media. Pls.' Mot. at 19 (citing Rolfes Decl. ¶¶ 7–8). Finally, Plaintiff AAH, whose functions include providing education, information, and assistance to "concerned residents in the Houston Ship Channel area where many refineries and other chemical plants are located," Pl.'s Mot. at 17 (citing Decl. of Dr. Bakeyah Nelson, ECF No. 15-1 [hereinafter Nelson Decl.], ¶¶ 3–5), claims that it "has had to rely upon research partnerships with other environmental organizations," "outside sources such as state databases and National Response Center reports," and its own on-the-ground investigation to compile information on accidental chemical releases in its area, *id.* at 17–18 (citing Nelson Decl. ¶¶ 9–10). The Board does not dispute that any of these Plaintiffs has incurred additional costs due to the absence of accidental chemical release information that otherwise would be available through the CSB. *See generally* Def.'s Mem; Def.'s Reply. Based then on Plaintiffs' uncontested declarations, the court finds they have established organizational standing to challenge the CSB's inaction.

c.  Associational standing

Finally, Plaintiffs AAH and LBB assert they have associational standing. Courts "have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington*

*State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Implicit in this standard is that the organization in question has members. *See Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (finding that an organization "stumbles on the first step" where "it is not clear that [the organization] has either members or any equivalent affiliates").

But even if a plaintiff is not a membership organization in the "traditional . . . sense," it still may qualify for associational standing. *See Hunt*, 432 U.S. at 344. In such cases, the Supreme Court in *Hunt* identified three factors that would make an entity the "functional equivalent of a traditional membership organization." *Fund Democracy*, 278 F.3d at 25. First, the court in *Hunt* found that the entity in that case, a state commission, served a "specialized segment" of the population; second, the commission possessed "all of the indicia of membership in an organization," such as stakeholders electing the organization leadership and financing its activities; and finally, the fortunes of the commission were closely tied to those of its constituency. *Hunt* 432 U.S. at 344–45; *see also Fund Democracy*, 278 F.3d at 26.

The court assesses AAH's and LBB's claims to associational sanding separately. First, the court quickly disposes of AAH's claim. Nothing in the record indicates that AAH has members. *See generally* Pls.' Mot; Pls.' Reply. Without members, AAH would have to establish that it is sufficiently analogous to a membership organization under the *Hunt* factors. Plaintiffs, however, offer no evidence to support that AAH satisfies any of those factors. *See generally* Pls.' Mot; Pls.' Reply. Therefore, the court finds that AAH lacks associational standing.

LBB's claim of associational standing requires more attention. For their part, Plaintiffs assert that LBB is a membership organization and therefore it can claim associational standing if one of its members has standing. Pls.' Reply at 6. The CSB, on the other hand, insists that LBB

is neither a traditional membership organization nor the functional equivalent of one. Defs.' Stmt. at 14–15; Defs.' Reply at 8–9.

The present record establishes that LBB is a traditional membership organization for standing purposes and therefore the court need not consider the *Hunt* factors. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 29 (D.D.C. 2009) (noting that an "inquiry into the 'indicia of membership' that occupies the [defendant]'s focus is necessary only when an organization is not a 'traditional membership organization'") (citation omitted). According to its Founding Director, LBB is a membership organization. *See* Rolfes Decl. ¶ 9. Per the organization's Bylaws, its members "consist of contributors (persons contributing at least $15 per year) to the [LBB], volunteer air samplers, members of the local community groups that [LBB] supports, the members of the Board of Directors, staff members and an Executive Director." LBB Bylaws, Art. II § 1. Although general members lack voting rights, they may participate in LBB through service on "committees of the organization" and by making recommendations for board members. *Id.* Art. II §§ 2; Art. V § 1. LBB operates through its Board of Directors who, as noted, are members of LBB. *See* Art. II; III § 1. Board Members are responsible for the "overall policy and direction of [LBB]," and the Board "sets forth policy, raises money, reviews and approves projects, oversees finances and projects, and supervises the Executive Director." *Id.* § 2.

The CSB attacks LBB's status as a membership organization because its "by-laws do not provide for members to affirmatively . . . join" the organization or to "participate in any meaningful sense in developing [its] policies and goals." Def.'s Reply at 8–9. That may be true to some degree, but those features do not render LBB a non-membership organization. In *AARP v. U.S. Equal Employment Opportunity Commission*, the court held that AARP was a membership organization that could assert associational standing even though its "members play less of a role

in the running of the organization than do members of organizations who, for example, directly elect their leadership and hold regular general membership meetings." 267 F. Supp. 3d 14, 23 (D.D.C. 2017). Recognizing that caselaw has not specifically defined what constitutes a "membership organization," the court held that AARP had sufficient indicia of a membership organization and differed from those entities that courts had held did not qualify for associational standing. *See id.* This court finds the same is true of LBB. Although members of LBB lack some of the governing authority found in some other membership organizations, that fact is not fatal. At least a subset of members—Board Members and the Executive Director—do exercise the governance function of the organization. Additionally, members fund the organization through voluntary contributions. And there can be little doubt that LBB's fortunes are tied to those of its constituency. These qualities are sufficient to qualify LBB for associational standing.

The question remains whether the members of LBB "would otherwise have standing to sue in their own right." Plaintiffs argue that LBB's Executive Director, Anne Rolfes, who is a member, at least has standing. *See* Pls.' Reply at 7. Rolfes asserts that she is "directly exposed to chemical emissions" during trips related to her work with LBB, including on an annual bike ride to raise awareness of chemical emission dangers, and she experiences fear and anxiety about accidental releases. Rolfes Decl. ¶¶ 5, 10. She maintains that the "absence of the reporting regulation causes a substantially increased risk of harm to me and other members of LBB who live or work near chemical plants and refineries," and that implementing such regulations would

> provide prompt and complete information to the CSB and the public that would assist the CSB in performing its functions to investigate accidents and recommend safety improvements, and would timely supply important information to nearby residents so that they can take measures to protect themselves.

*Id.* ¶ 11. Rolfes thus claims a "procedural right" to have the CSB promulgate the regulations that Congress mandated. *See Lujan*, 504 U.S. at 572 n.7; *PETA*, 797 F.3d at 1102 (Millet, J., dubitante) (describing the alleged failure to promulgate regulations as a "procedural right"); *cf. Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1208 (D.C. Cir. 1996) (characterizing the denial of the opportunity to participate in notice and comment as a deprivation of a "procedural right").

It is not enough for a plaintiff to simply assert a deprivation of a procedural right to establish standing. Rather, the plaintiff must claim "some concrete interest that is affected by the deprivation . . ." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). If a plaintiff can establish such a concrete injury, then the causation and redressability prongs of standing are relaxed. *See Lujan*, 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). A litigant "has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). She need only show that the risk of harm posed, as here, by the agency's inaction "would be reduced by some extent if [the plaintiff] received the relief they seek." *Id.* at 526.

Here, Rolfes has standing in her own right. First, she has identified two forms of concrete harm: injury to her health from exposure to chemical emissions and a diminished ability to collect information about such emissions to carry out her professional duties to LBB and its constituents. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181–83 (2000) (finding that statements from organization members regarding the proximity of their homes or areas of activity to contaminated areas and their aversion to continuing with activities in those

areas due to contamination "adequately documented injury in fact"). As for causation and redressability, the agency's owns words supply the required connection. During its one and only effort to promulgate the mandatory reporting regulations, the CSB recognized that such a mandate "could help the agency develop better information on chemical incidents occurring in the United States, and help both the agency *and other organizations* to identify issues and trends, and thereby *further the cause of preventing chemical incidents*." Chemical Release Reporting at 30,260 (emphasis added). It also stated that "a reporting rule would also be helpful to the CSB in improving the timeliness, completeness, and accuracy of the information it now collects on chemical incidents." *Id.* Although the CSB now dismisses these statements as "preliminary thoughts" that are not "conclusive," Def.'s Mem. at 16, they suffice at this stage to establish that mandatory-reporting regulations would reduce "to some extent" the health risks that Rolfes (and others) face and would provide her with information needed to educate and advise communities affected by chemical releases. *See also* U.S. GOV'T ACCOUNTABILITY OFFICE, Chemical Safety Board: Improvements in Management and Oversight Are Needed, GAO-08-864R Chemical Safety Board 4, 7 (2008) (observing that the "lack of data-reporting regulations and these data quality problems limit CSB's ability to target its resources, identify trends and patterns in chemical incidents, and prevent future similar accidents").

Accordingly, because its member Rolfes has standing, the court finds that LBB also has associational standing.[2]

---

[2] Defendant also argues that, even if Ms. Rolfes has individual standing, "that issue is ultimately irrelevant" because "Ms. Rolfes is not an individual plaintiff." Def.'s Reply at 10. For purposes of associational standing, the member need not be a party, and in this case Ms. Rolfes is not necessary to resolve any claim or grant any relief requested.

## B. Agency Action Unlawfully Withheld or Unreasonably Delayed

The court at last reaches the merits of Plaintiffs' claim. The APA provides that courts "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs assert that the CSB's failure to promulgate accidental release-reporting regulations constitutes both "unlawfully withheld" and "unreasonably delayed" agency action. *See* Compl. ¶¶ 33, 34.

To compel agency action that is "unlawfully withheld," a plaintiff must demonstrate "that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The Supreme Court has recognized that "a specific statutory command requiring an agency to promulgate regulations by a certain date" qualifies as a "discrete agency action." *Id.* at 71. In this case, although the CSB's enabling act does not require the agency to establish reporting regulations by a date certain, there can be no doubt that the congressional directive to adopt such regulations is a discrete act that the CSB is required to take. In the past, the CSB readily conceded that "a reporting regulation is clearly required by the statute." Chemical Release Reporting at 30,260. It does not contend otherwise now. Accordingly, the court finds in favor of Plaintiffs on their APA claim based on the CSB's unlawful withholding of agency action.

The court also finds that the Board's inaction with regard to reporting regulations has been "unreasonably delayed." The D.C. Circuit has identified multiple factors relevant to deciding whether an agency's delay is unreasonable. *See Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984). But in this case the court need not dwell on those factors, because the D.C. Circuit has *never* held that a delay of the magnitude present here—more than 20 years— can be reasonable. To the contrary, the D.C. Circuit has found far less time to constitute an

unreasonable delay.  For example, in *In re American Rivers & Idaho Rivers United*, the court stated that "a reasonable time for agency action is typically counted in weeks or months, not years," and found that a six-year delay in responding to a rulemaking petition was unreasonable.  372 F.3d 413, 419 (D.C. Cir. 2004).  Similarly, in *Midwest Gas Users Ass'n v. F.E.R.C.*, the court noted "generally that a reasonable time for an agency decision could encompass months, occasionally a year or two, but not several years or a decade,'" and held that four years was unreasonable delay.  833 F.2d 341, 359 (D.C. Cir. 1987) (quoting *MCI Telecomm. Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir. 1980)).  And, in *Nader v. F.C.C.*, the D.C. Circuit declared that "nine years should be enough time for any agency to decide almost any issue."  520 F.2d 182, 206 (D.C. Cir. 1975).  Under this precedent, twenty years of inaction is not merely unreasonable; it is an egregious abdication of a statutory obligation.  *Cf. Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983) (stating that delays "are less tolerable when human lives are at stake").

The CSB's only justification for its inaction is that it is "a small agency with very limited resources" that has "prioritized its investigatory activities over [ ] rulemaking."  Def.'s Mem at 21.  But, if that is the case, the solution to its resource constraints is not to ignore a congressional directive.  It is to return to Congress and ask for relief from the statutory requirement.

*        *        *

Having found the CSB in violation of the APA, the question remains as to the appropriate remedy.  *See Cobell v. Norton*, 240 F.3d 1081, 1108 (D.C. Cir. 2001) (stating that "the district court has substantial ability to order that relief which is necessary to cure [an agency's] legal transgressions").  The CSB asks the court to allow it 24 months to sign a final rule.  Def.'s Mem at 22.  That request is supported with a declaration from the CSB's Executive Director of Investigations and Recommendations, Stephen Klejst.  *See* Def.'s Mot., Decl. of Stephen J. Klejst,

ECF No. 21-3.  Klejst states that "[i]nternal estimates of time required to complete a chemical release reporting rule include approximately twelve months to issue and receive comments on a notice of proposed rule, and approximately twelve additional months from the date of closure of comments received on the notice of proposed rule to complete a final rule."  *Id.* ¶ 31.  Klejst, however, offers no support for these assertions.  They are simply conclusory.  The CSB already has had 20 years to promulgate regulations.  The court will not grant it two full years to do what it should have done long ago.

The court will order the CSB to promulgate final accidental chemical release reporting regulations within twelve months from this date.

## IV.     CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is granted, and Defendant's Cross-Motion for Summary Judgment is denied.

A final appealable order accompanies this Memorandum Opinion.

Dated:  February 4, 2019

Amit P. Mehta
United States District Judge